THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
IRIS THOMAS, Defendant-Appellant.

First District (2nd Division)   No. 85—2720

Opinion filed March 16, 1988.—Rehearing denied April 15, 1988.

Paul P. Biebel, Jr., Acting Public Defender, of Chicago (Marilyn Martin, Assistant Public Defender, of counsel), for appellant.

Richard M. Daley, State's Attorney, of Chicago (Thomas V. Gainer, Jr., James E. Fitzgerald, and Paul W. Groah, Assistant State's Attorneys, of counsel), for the People.

JUSTICE STAMOS delivered the opinion of the court:

In October of 1983, the defendant, Iris Thomas (Thomas), was charged with the murder of Leslie Celleland (Celleland). Thereafter, Thomas was found unfit to stand trial. On May 21, 1985, Thomas was given a discharge hearing wherein the court found Thomas not guilty by reason of insanity. Thomas' commitment hearing took place on August 14, 1985. The court found that an extended term of commitment was appropriate in Thomas' case because the fatal beating of Celleland was brutal and heinous conduct indicative of wanton cruelty. The court then imposed a term of 50 years. The court, however, reduced the period of commitment based upon credit for time served and compensatory time. Therefore, the court concluded that the maximum amount of time that Thomas could spend in the custody of the Department of Mental Health and Developmental Disabilities was 24 years, 9 months. Thomas filed notice of this appeal on September 13, 1985.

Thomas was charged with Celleland's murder in October of 1983. Thomas was originally found unfit to stand trial on December 29, 1983. Thomas was then found fit to stand trial on April 19, 1984, but again found unfit on May 8, 1984. Another fitness hearing was held on May 21, 1984; Thomas was again found unfit to stand trial. A discharge hearing immediately followed the May 21 fitness hearing. At the discharge hearing, both parties stipulated to the testimony of Mary Trivette (Trivette), Diana Scott (Scott), Steven Czyzniejewsky (Czyzniejewsky), and various doctors and police officers. The stipulated testimony provided the following evidence.

In October 1983, Trivette owned and operated a boarding house located at 15744 Washtenaw in Markham, Illinois, where the Depart-

ment of Mental Health and Developmental Disabilities sometimes placed patients who were considered not to be in need of medical treatment. At the time, Thomas, Scott, and the victim, Celleland, lived in Trivette's boarding house.

On October 4, 1983, Thomas, Scott, and Celleland were in the living room of the boarding house. Celleland and Thomas began to argue about a haircut that Celleland had given to Thomas. Thomas, extremely displeased with the haircut, left the room and returned with a baseball bat. Celleland was unarmed and made no aggressive movements toward Thomas. Holding the bat over Celleland, Thomas announced that she was going to hit Celleland over the head.

In the meantime, Trivette's son, Czyzniejewsky, who was watching television in another room, heard Thomas and Celleland arguing. He heard Thomas say "bitch you cut my hair." Scott called Czyzniejewsky into the living room and Czyzniejewsky watched as Thomas threatened and then struck Celleland repeatedly around the head and arm with the bat. Czyzniejewsky then ran to a neighbor to call the police.

Trivette, who had left the house earlier, returned at approximately one o'clock that afternoon. She entered the living room and saw Celleland lying on the floor with Thomas standing over her holding a baseball bat. Thomas told Trivette to stay out of the way so that she could finish the job. Trivette tried to seize the bat. During the struggle, the bat was dropped. One of Trivette's neighbors then arrived and called an ambulance and the police. When the police came, Thomas calmly surrendered herself to them.

An ambulance took Celleland to the emergency room at Ingalls Memorial Hospital, where she was pronounced dead. Doctor Donaghue then performed an autopsy on Celleland. The examination revealed that there were 44 external points of injury on Celleland's head, arms, and upper body. These included lacerations, bruises, and contusions. The internal injuries consisted of a skull fracture, multiple brain contusions, a bite mark on the tongue, and hemorrhages. In Doctor Donaghue's opinion, Celleland had died of cranial cerebral injury due to a beating. After considering all of the State's evidence in support of the murder charge and all of the defendant's evidence in support of her insanity defense, the court found Thomas not guilty by reason of insanity.

Thomas' commitment hearing was held on August 14, 1985. Dr. Edith Hartman (Dr. Hartman), Thomas' treating psychiatrist since January of 1984, testified as to Thomas' condition. Dr. Hartman testified that Thomas' behavior had been very erratic and disorganized over the last three months. Dr. Hartman recalled an incident where

Thomas had rolled in her own vomit. Furthermore, in July of 1985, Thomas was found to be suicidal, and in May of 1985, Thomas began hearing voices telling her that she was a killer and that she may kill again.

In Dr. Hartman's opinion: Thomas has a schizophrenic disorder, the chronic undifferentiated type; Thomas is capable of inflicting serious harm on herself and others; Thomas becomes impulsive, threatening and unpredictable if taken off of her medication; and Thomas should be kept in a secure hospital setting. At the conclusion of the hearing, the court found that because of her illness, Thomas was subject to involuntary admission and that she was in need of mental health services on an inpatient basis. The court held that an extended term of commitment of 50 years was appropriate on the grounds that the fatal beating of Celleland was brutal and heinous conduct indicative of wanton cruelty. After deducting credit for time served and compensatory time, the court remanded Thomas to the custody of the Department of Mental Health and Developmental Disabilities for a total of 24 years and 9 months. On September 13, 1985, Thomas filed notice of this appeal.

Following the discharge hearing, the trial court found that Thomas was not guilty by reason of insanity. In addition, the court found that Thomas was subject to involuntary admission.

" 'Subject to involuntary admission' means: A defendant has been found not guilty by reason of insanity; and

(i) who is mentally ill and who because of his mental illness is reasonably expected to inflict serious physical harm upon himself or another in the near future; or

(ii) who is mentally ill and who because of his illness is unable to provide for his basic physical needs so as to guard himself from serious harm." (Ill. Rev. Stat. 1983, ch. 38, par. 1005—2—4.)

Furthermore, once a defendant is found not guilty by reason of insanity and it is determined that the defendant is subject to involuntary admission, certain procedures must be followed. More specifically, section 5—2—4(b) of the Unified Code of Corrections provides:

"If the Court finds the defendant subject to involuntary admission or in need of mental health services on an inpatient basis, the admission, detention, care, treatment or habilitation, review proceedings, and discharge of the defendant after such order shall be under the Mental Health and Developmental Disabilities Code, except that the initial order for admission of a defendant acquitted of a felony by reason of insanity shall be

for an indefinite period of time. Such period of commitment shall not exceed the *maximum length of time* that the defendant would have been required to serve, less credit for good behavior, before becoming eligible for release had he been convicted of and received the *maximum sentence* for the most serious crime for which he has been acquitted by reason of insanity." (Emphasis added.) Ill. Rev. Stat. 1983, ch. 38, par. 1005—2—4.

Under section 5—8—1 of the Unified Code of Corrections, the imprisonment term for murder shall be a determinate sentence that shall be not less than 20 years and not more than 40 years. (Ill. Rev. Stat. 1983, ch. 38, par. 1005—8—1.) Illinois law, however, provides that a judge may extend the sentence of an offender to a term of imprisonment in *excess* of the maximum sentence that section 5—8—1 authorizes if the judge finds that any of the aggravation factors are present. (Ill. Rev. Stat. 1983, ch. 38, par. 1005—8—2.) Where any of the aggravation factors are found to be present in a murder case, under section 5—8—2, the imprisonment term may be extended to be not less than 40 years, and not more than 80 years. (Ill. Rev. Stat. 1983, ch. 38, par. 1005—8—2.) Thus, the *maximum* sentence that may be imposed in a murder case is 80 years. Section 5—5—3.2(b) of the Unified Code of Corrections sets forth the factors in aggravation that the court may consider in determining whether to extend the defendant's sentence under section 5—8—2.

"(1) When a defendant is convicted of any felony, after having been previously convicted in Illinois of the same or greater class felony, within 10 years, excluding time spent in custody, and such charges are separately brought and tried and arise out of different series of acts; or

(2) When a defendant is convicted of any felony and the court finds that the offense was accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty; or ***." Ill. Rev. Stat. 1983, ch. 38, par. 1005—5—3.2.

In the case at bar, the trial court determined that an extended term of commitment was appropriate because the offense was accompanied by brutal and heinous behavior indicative of wanton cruelty. The court set the total commitment term at 50 years. However, with credit for time served and compensatory time, the commitment term was reduced to a period of 24 years, 9 months.

The defendant-appellant, Thomas, argues that the trial court erred when it imposed the original extended term of 50 years upon her. Thomas contends that the original 50-year sentence exceeds the

maximum sentence for murder set forth in section 5—8—1 by 10 years. Thomas further claims that the trial court erred when it found that an extended term of commitment was appropriate in her case. Thomas argues that the court's finding that she was not guilty by reason of insanity was legally inconsistent with the court's finding that the offense against Celleland was accompanied by brutal and heinous conduct indicative of wanton cruelty. Thomas concludes that because the court determined that she was insane at the time of the offense, the court is collaterally estopped from finding that she exercised brutal and heinous conduct indicative of wanton cruelty when she killed Celleland. Thomas also contends that imposition of the extended sentence constituted punishment for actions for which she was not criminally responsible and violated her due process rights.

█ █ Imposition of an extended-term sentence is a matter of judicial discretion that will be reversed only upon a finding of an abuse of that discretion. (*People v. Darnell* (1981), 94 Ill. App. 3d 830, 836, 419 N.E.2d 384; *People v. Adams* (1980), 91 Ill. App. 3d 1059, 1065, 415 N.E.2d 610; *People v. Miller* (1980), 90 Ill. App. 3d 422, 428, 413 N.E.2d 143.) The factors in aggravation found in section 5—5—3.2(b) are set forth in the disjunctive. (*People v. Clay* (1984), 124 Ill. App. 3d 140, 152-53, 463 N.E.2d 929.) Therefore, the presence of *any* of these factors is sufficient for imposition of an extended-term sentence. (*People v. McFarland* (1981), 93 Ill. App. 3d 136, 144, 416 N.E.2d 769; *People v. Sally* (1980), 84 Ill. App. 3d 167, 171, 405 N.E.2d 407.) The presence of any of these factors in the case of murder increases the permissible sentence from a term of 20 to 40 years to a term of 40 to 80 years. (*Clay*, 124 Ill. App. 3d at 153.) Moreover, although the legislature has decided that certain statutory factors are to be considered in determining whether a court may impose an extended sentence, it is not incorrect for a trial court to also consider nonstatutory factors in aggravation when imposing an extended sentence. *People v. Allen* (1983), 119 Ill. App. 3d 845, 846, 457 N.E.2d 77.

Thomas contends that the trial court does not have the discretion to impose an extended-term sentence. In support of her position, Thomas cites the case of *People v. Leppert* (1982), 105 Ill. App. 3d 514, 434 N.E.2d 21. *Leppert*, however, is easily distinguishable from the instant case.

In *Leppert*, the defendant was charged with attempted murder; the jury returned a verdict of not guilty by reason of insanity. The jury found that the defendant was a person subject to involuntary admission to a mental health facility. Therefore, the court committed the defendant to a mental health facility for an indefinite period of time

not to exceed 10 years.

In applying the statutory formula for commitment found in section 5—2—4(b) of the Unified Code of Corrections, the court in *Leppert* determined that the maximum length of time that the defendant could be involuntarily committed was 15 years. Unlike the trial court in the case at bar, the *Leppert* court *did not* discuss imposition of an extended-term sentence (section 5—8—2 of the Unified Code of Corrections).

As did the trial court in *Leppert,* the trial court in the present case correctly applied section 5—2—4(b) in determining the maximum length of time that Thomas could be involuntarily committed. The court in the instant case, however, went further and, based upon the section 5—5—3.2(b) aggravation factors, gave Thomas an extended-term sentence. The case at bar, therefore, is consistent with the *Leppert* case. The issue debated here, however, involves imposition of the extended-term sentence. This issue was not addressed in *Leppert.* Therefore, *Leppert* does not support Thomas' argument that the trial court does not have discretion to impose an extended-term sentence.

In essence, Thomas takes the position that aggravating factors cannot be used to give an extended term of commitment to an insanity acquittee. This, however, is not the law in Illinois. (See *People v. Larson* (1985), 132 Ill. App. 3d 594, 478 N.E.2d 439.) "[T]he purpose of commitment following an insanity acquittal is to treat the individual's mental illness, and at the same time protect him and society from his potential dangerousness." *People v. Williams* (1986), 140 Ill. App. 3d 216, 228, 488 N.E.2d 649.

In *Larson,* the defendant's mother and stepfather were stabbed to death inside of their home. The defendant later admitted to stabbing the victims and to setting their house on fire. The defendant was charged with theft and two counts of murder. The defendant was found not guilty by reason of insanity. The trial court imposed an extended-term sentence of 80 years less credit for good behavior. (*Larson,* 132 Ill. App. 3d at 595.) The trial court concluded that the murders were accompanied by "exceptionally brutal or heinous behavior indicative of wanton cruelty" and that an extended term was thus appropriate. The defendant appealed and contended that the commitment period constituted improper punishment and that the trial court's determination violated his rights to equal protection and due process of the law.

In affirming the trial court, the appellate court first held that the "maximum sentence" referred to in section 5—2—4(b) dictated that the trial court must refer to the existing sentencing scheme in deter-

mining the most severe punishment that could be imposed for a conviction of murder. (*Larson*, 132 Ill. App. 3d at 597.) The appellate court concluded that the 80-year maximum sentence, appropriate under the extended-term statute, was the "maximum sentence" for a murder conviction under the section 5—2—4(b) formula. *Larson*, 132 Ill. App. 3d at 597.

The appellate court also concluded that the extended-term statute did not constitute punishment of an insanity acquittee. (*Larson*, 132 Ill. App. 3d at 598.) The court reasoned that "the extended-term statute does not change the rehabilitative focus of criminal commitment. It also does not alter the indefinite character of the commitment period, since defendant may be released anytime he regains his sanity. The trial court's actions simply provided for a potentially longer period in which defendant could receive treatment subject to judicial review." *Larson*, 132 Ill. App. 3d at 600.

In addressing the defendant's due process argument, the court noted that the due process clause requires that a statute reasonably accomplish constitutionally permissible objectives. (*People v. Raseaitis* (1984), 126 Ill. App. 3d 600, 608, 467 N.E.2d 1098.) Section 5—2—4(b) seeks to ensure that insanity acquittees are not indeterminately committed while at the same time, society is protected from the release of insane individuals who are capable of committing dangerous acts. (*Larson*, 132 Ill. App. 3d at 600.) Discretionary application of the extended-term statute to insanity acquittees works to protect the interests of society and the interests of insanity acquittees. Thus, the court concluded that its utilization was not violative of the due process rights of insanity acquittees. *Larson*, 132 Ill. App. 3d at 600; see also *Jones v. United States* (1983), 463 U.S. 354, 77 L. Ed. 2d 694, 103 S. Ct. 3043.

In *Jones*, the petitioner was charged with attempted petit larceny, a misdemeanor with a maximum one-year prison sentence. The court found the petitioner not guilty by reason of insanity and committed him to St. Elizabeths, a public hospital for the mentally ill.

As required under the District of Columbia Code, the court held a 50-day hearing. At the hearing, a psychologist from St. Elizabeths testified for the government that, in the staff's opinion, the petitioner continued to suffer from paranoid schizophrenia and that "because his illness is still quite active, he is still a danger to himself and to others." (*Jones*, 463 U.S. at 360, 77 L. Ed. 2d at 702, 103 S. Ct. at 3047.) A second release hearing was held. As of the second hearing, the petitioner had been in St. Elizabeths for more than one year. The petitioner therefore demanded that he be released unconditionally or

recommitted pursuant to the existing civil commitment standards. The court denied the petitioner's requests, reaffirmed the findings made at the 50-day hearing and continued the petitioner's commitment. The United States Supreme Court granted *certiorari*.

The issue before the Court was whether the petitioner must be released from St. Elizabeths because he had been hospitalized for a period longer than he might have served in prison if convicted. The Court answered in the negative.

The petitioner argued that the due process standards were not met in his case because the judgment of not guilty by reason of insanity did not constitute a finding of present mental illness and dangerousness since it was established only by a preponderance of the evidence. (*Jones*, 463 U.S. at 362, 77 L. Ed. 2d at 704, 103 S. Ct. at 3048.) The petitioner concluded that, because the government's only justification for automatic commitment was to ensure that insanity acquittees do not escape confinement entirely, his period of confinement at St. Elizabeths could only be for one year (the maximum prison sentence that he would have received if convicted).

In addressing the petitioner's arguments, the Court stated that the purpose of commitment following an insanity acquittal is to treat the insanity acquittee's mental illness and protect him and society from his potential dangerousness. (*Jones*, 463 U.S. at 368, 77 L. Ed. 2d at 708, 103 S. Ct. at 3051-52.) The Court continued that until he has recovered his sanity or is no longer dangerous, the insanity acquittee is not entitled to release. (*Jones*, 463 U.S. at 368, 77 L. Ed. 2d at 708, 103 S. Ct. at 3052.) As he was not convicted, the insanity acquittee may not be punished. Therefore, his confinement is based upon his continuing illness and dangerousness. *Jones*, 463 U.S. at 369, 77 L. Ed. 2d at 708, 103 S. Ct. at 3052.

It thus follows that one who committed a less serious offense may be confined for a longer period if he remains ill and dangerous. Consequently, no correlation exists between the severity of the offense and the length of time necessary for recovery. (*Jones*, 463 U.S. at 369, 77 L. Ed. 2d at 708, 103 S. Ct. at 3052.) In short, the length of the insanity acquittee's hypothetical criminal sentence is irrelevant to the purposes of his commitment. (*Jones*, 463 U.S. at 369, 77 L. Ed. 2d at 708, 103 S. Ct. at 3052.) In affirming the court below, the United States Supreme Court held that "when a criminal defendant establishes by a preponderance of the evidence that he is not guilty of a crime by reason of insanity, the Constitution permits the Government, on the basis of the insanity judgment, to confine him to a mental institution until such time as he has regained his sanity or is no

longer a danger to himself or society." *Jones*, 463 U.S. at 370, 77 L. Ed. 2d at 709, 103 S. Ct. at 3053.

*Jones* and *Larson* are clearly precedent for the case presently before this court. In the instant case, Thomas was found not guilty by reason of insanity. Like the trial court in *Larson*, the trial court below believed that the extended-term statute was applicable due to the brutal and heinous way in which the defendant had committed the offense. The defendant in *Larson* argued several of the same points that Thomas sets forth now. Based upon the reasoning in the *Jones* and *Larson* cases, Thomas' punishment and due process arguments must fail.

■ The next issue to be addressed is Thomas' contention that the trial court's finding that she was not guilty by reason of insanity was legally inconsistent with the court's finding that Celleland's murder was accompanied by brutal and heinous conduct indicative of wanton cruelty. Thomas claims that the trial court was collaterally estopped from making a finding of "wanton cruelty" once the court had determined that Thomas was legally insane. In sum, Thomas claims that the state of mind necessary for "wanton cruelty" "stands in stark contrast to the exculpation of one who commits an involuntary act."

In asserting her collateral estoppel argument, Thomas contends that the defendant's state of mind at the time of the offense is a relevant factor in computing an extended-term sentence. Thomas relies on two Illinois cases to support this proposition. (See *People v. Evans* (1981), 87 Ill. 2d 77, 429 N.E.2d 520; *People v. Treadway* (1985), 138 Ill. App. 3d 899, 486 N.E.2d 929.) On the contrary, "[a]pplication of the extended-term statute is determined by the 'offense' rather than by the extent or nature of the defendant's participation." (*Larson*, 132 Ill. App. 3d at 598.) "Courts have recognized that the dangerousness manifested by an insanity acquittee's criminal acts justifies additional safeguards prior to his release from detention." (*Larson*, 132 Ill. App. 3d at 598.) Therefore, in deciding whether to impose an extended-term sentence, the court is to look at the offense itself. See, *e.g., Larson*, 132 Ill. App. 3d 594; *People v. Clay* (1984), 124 Ill. App. 3d 140, 463 N.E.2d 929; *People v. Cox* (1983), 113 Ill. App. 3d 136, 446 N.E.2d 1280.

In *Larson*, set forth in detail above, the defendant was found to be legally insane. Nevertheless, the court looked to the offenses, the fatal stabbing of the two victims, and determined that the defendant exercised exceptionally brutal and heinous conduct indicative of wanton cruelty. The extended-term statute was thus applied despite the

fact that the defendant was found legally insane at the time of the offenses.

In *Clay*, the defendant was convicted of murder, attempted armed robbery, and conspiracy to commit armed robbery. The trial court then sentenced the defendant under the extended-term statute. The defendant appealed and argued that he was simply an accomplice to the crimes and that the finding of "brutal conduct indicative of wanton cruelty" could not be used against him in order to impose an extended sentence. (*Clay*, 124 Ill. App. 3d at 153-54.) In disagreeing with the defendant's position, the appellate court reasoned that "because the application of the extended-term statute is determined by the offense, not by the extent or nature of the offender's participation therein, the fact that a defendant is convicted under the theory of accountability or that his participation in the crime was less than that of his co-offenders does not preclude the imposition of an extended sentence upon him." (*Clay*, 124 Ill. App. 3d at 154.) Therefore, it appears that a defendant need not even be present at the scene of a "brutal or heinous offense" to receive an extended-term sentence based on the brutality and heinousness of the offense. Thus, *Clay* further supports the proposition that the offense itself, and not the defendant's state of mind at the time of the offense, is the relevant factor in assessing an extended-term sentence under section 5—5—3.2(b).

In *Cox*, the defendant severely burned and beat her four-year-old son to death. The defendant was charged with her son's murder. After a bench trial, the defendant was convicted of involuntary manslaughter. A defendant commits involuntary manslaughter when he unintentionally kills another if his acts are likely to cause death or great bodily harm and he performs them recklessly. (Ill. Rev. Stat. 1983, ch. 38, par. 9—3(a).) After a finding that the defendant's actions were "accompanied by exceptionally brutal and heinous behavior indicative of wanton cruelty," the trial court imposed an extended-term sentence of 10 years. *Cox*, 113 Ill. App. 3d at 138.

On appeal, the defendant argued that the trial court abused its discretion when it applied the extended-term statute. The appellate court rejected the defendant's contention and stated that there was no question that the defendant had brutally abused the victim. (*Cox*, 113 Ill. App. 3d at 139.) Thus, the trial court focused upon the offense itself (the scalding and beating of the victim) in determining that the extended-term statute applied to the defendant. *Cox*, 113 Ill. App. 3d at 138-39.

The cases that Thomas sets forth in support of her contention that the defendant's state of mind at the time of the offense is a rele-

vant factor in computing an extended-term sentence can be easily distinguished from the case at bar. In *Evans,* the defendant was chasing Davenport around a car. At the same time, the defendant was firing shots at Davenport. After the chase ended, Wilson, an acquaintance of both Davenport and the defendant, was found lying on the ground nearby with a bullet wound in his chest. Wilson later died. The defendant was charged with murder.

Upon a finding that the defendant's actions toward Davenport were committed under the belief that the defendant was acting in self-defense, the jury found the defendant guilty of voluntary manslaughter. The trial court found that the defendant's acts constituted wanton cruelty and imposed an extended sentence for voluntary manslaughter. The appellate court affirmed the defendant's conviction but vacated the extended sentence and remanded the case for resentencing.

One of the issues before the Illinois Supreme Court was whether the trial court erred in imposing an extended sentence for the defendant's voluntary manslaughter conviction. The Illinois Supreme Court stated that the trial court could only have imposed an extended-term sentence if the voluntary manslaughter offense "were accompanied by wanton cruelty." (*Evans,* 87 Ill. 2d at 87.) The court first noted that it was a stray bullet that had apparently killed Wilson. The court continued "[i]nasmuch as Wilson was an unintended victim and none of Evans' [the defendant's] actions were directed toward Wilson, we concur in the appellate court's determination that the voluntary manslaughter offense was not accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty." *Evans,* 87 Ill. 2d at 87.

Thus, it is apparent from the court's language that the court relied strongly on the facts that Wilson was killed by a *stray* bullet, that Wilson was an unintended victim, and that none of the defendant's actions were directed toward Wilson when it concluded that the defendant's behavior toward Wilson was not brutal or heinous behavior indicative of wanton cruelty. Therefore, it is apparent that the unintentional and "freak" killing of Wilson persuaded the court that there was an absence of wanton cruelty.

The court later went on to conclude that one's subjective belief that he is acting in self-defense does not constitute wanton cruelty. (*Evans,* 87 Ill. 2d at 88.) Here, however, the court was focusing upon the defendant's state of mind toward Davenport, not the defendant's state of mind toward the victim, Wilson. Furthermore, it appears that the court's discussion of the defendant's subjective belief (that he was acting in self-defense) related to the issue of whether the jury prop-

erly found the defendant guilty of voluntary manslaughter rather than murder.

Moreover, the defendant in *Evans* was not an insanity acquittee. Society's interest in being protected from the dangerous propensities of an insane acquittee who is prematurely released from confinement was not an issue in *Evans*. It is a major issue, however, in the case at bar.

In *Treadway*, the defendant was convicted of the attempted murder of Colleen Anaya (Anaya). The defendant stabbed Anaya several times before Anaya was rescued. The court imposed an extended-term sentence of 60 years. The defendant appealed.

On appeal, the court reduced the defendant's sentence to 30 years. The court, however, reduced the defendant's sentence pursuant to Supreme Court Rule 615(b)(4) (107 Ill. 2d R. 615(b)(4)). The *Treadway* court *did not* overturn the trial court's finding that the defendant's conduct was brutal and heinous indicative of wanton cruelty. Rather, the *Treadway* court accepted the trial court's finding of wanton cruelty, but chose to reduce the defendant's sentence on other grounds.

In sum, a court is to focus upon the nature of the offense when deciding whether an extended-term sentence should be imposed. The trial court's finding as to the defendant's mental state at the time of the offense has no bearing upon whether the defendant's conduct was brutal and heinous indicative of wanton cruelty. Thus, the trial court's finding that Thomas was legally insane at the time of the offense does not estop the trial court from imposing an extended-term sentence based upon Thomas' brutal and heinous conduct in committing the offense.

Therefore, the judgment of the circuit court is affirmed.

Affirmed.

HARTMAN, P.J., and BILANDIC, J., concur.